UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN JANOSKO, et al.,<br><br>    Plaintiffs,<br><br>    v.<br><br>CITY OF OAKLAND,<br><br>    Defendant. | Case No. 3:23-cv-00035-WHO<br><br>**ORDER DENYING MOTION FOR TEMPORARY RESTRAINING ORDER**<br><br>Re: Dkt. No. 36 |

Plaintiffs John Janosko and Jackson Blain filed this Motion for a Temporary Restraining Order ("TRO"), seeking to restrain the defendant City of Oakland from seizing and destroying property during a planned and ongoing cleanup of a homeless encampment in Oakland, California ("the 1707 Encampment"). For the reasons that follow, the motion is DENIED.

## BACKGROUND

On January 4, 2023, the plaintiffs filed their complaint and their first motion for a TRO, seeking to restrain the City of Oakland from carrying out a clear-out and eviction of the 1707 Encampment. [Dkt. Nos. 1, 4]. In that motion, the plaintiffs noted that the City had provided notice of the clear-out to the residents of the 1707 Encampment on December 22, 2022. [Dkt. No. 4] at 9. A subsequent declaration showed that the City began engaging with the residents of the 1707 Encampment in April 2022 and continued throughout fall and winter 2022 offering services, resources, information, and shelter. [Dkt. No. 25-1] (Declaration of LaTonda Simmons) ¶¶ 4-7.

After briefing and a hearing, I entered a TRO "on a limited basis," finding that the plaintiffs raised serious questions going to the merits of their state-created danger claims due to the confluence of the state-of-emergency weather situation in Northern California at the time, the lack of available shelter options to house the displaced individuals, and the then-existing

"tripledemic." [Dkt. No. 18]. I gave the City its requested twelve days to provide sufficient shelter beds, explaining that the TRO was "not a long-term solution" and would "be brief." *Id.*

On January 17, 2023, the City filed a supplemental brief stating it had been unable to provide the requisite shelter beds and asking for additional time to do so. [Dkt. No. 22]. I continued the decision on the dissolution of the TRO. [Dkt. No. 23].

On February 3, 2023, I entered an order scheduling the dissolution of the TRO for February 10, 2023, given the improved weather situation and the representations from the City that adequate shelter beds—including "tiny cabins" and a new RV site—would be ready for the displaced residents of the 1707 Encampment. [Dkt. No. 28]. On February 10, the plaintiffs filed a supplemental brief asserting the shelter spaces were not available; the City filed no response, and I entered an order maintaining the TRO. [Dkt. Nos. 29, 30].

On February 24, 2023, the City filed a status report stating that the shelter spaces were ready and that the displaced residents had begun to move out of the encampment. [Dkt. No. 31]. The plaintiffs filed no objections, and I entered an order dissolving the TRO on February 27, noting that the City addressed the state-created danger concerns and explaining that the public interest and hardship balance favored the City, in part because of its plans to develop the site into a large affordable housing complex. [Dkt. No. 32].

On March 30, 2023, the City posted Notices to Vacate, stating that the closure would begin on April 10, 2023. Declaration of LaTonda Simmons ("Simmons Decl.") [Dkt. No. 39-1] Ex. A.

Now, nearly a year after first receiving outreach from the City, sixteen weeks after first receiving notice of *this* closure, over six weeks after the TRO was dissolved, and thirteen days after receiving renewed notice of this removal,[1] and following relatively voluminous motion practice, the plaintiffs have moved for another TRO, arguing that the impending closure will violate their Fourth Amendment rights against unreasonable seizure. ("Mot.") [Dkt. No. 36]. The

---

[1] Both plaintiffs, as well as many residents of the 1707 Encampment, also participated in the prior litigation in *Blain v. California Department of Transportation*, No. 3:22-CV-04178-WHO, 2022 WL 3702106 (N.D. Cal. Aug. 26, 2022), and so have been on notice since early summer 2022 that they could not stay at the encampments on Wood Street and would have to move. *See also* Dkt. No. 25-1 ¶ 6.

2

City filed a response to the motion. ("Oppo.") [Dkt. No. 39]. I held a hearing at which counsel for both parties appeared. [Dkt. No. 41].

## LEGAL STANDARD

Federal Rule of Civil Procedure 65 governs TROs. The standard for issuing a TRO is the same as that for issuing a preliminary injunction, which requires the plaintiff to establish: (1) likelihood of success on the merits; (2) likelihood of irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in his favor; and (4) that an injunction is in the public interest. *See Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "Injunctive relief [is] an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Id.* at 22. The Ninth Circuit has held that "'serious questions going to the merits' and a hardship balance that tips sharply toward the plaintiff can support issuance of an injunction, assuming the other two elements of the Winter test are also met." *See All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1132 (9th Cir. 2011).

## DISCUSSION

### I.  LIKELIHOOD OF SUCCESS ON THE MERITS

The plaintiffs have not shown likelihood of success on the merits of these particular Fourth Amendment claims. Relying on *Lavan v. City of Los Angeles*, 693 F.3d 1022 (9th Cir. 2012), and *Garcia v. City of Los Angeles*, 11 F.4th 1113 (9th Cir. 2021), the plaintiffs argue that they are likely to succeed on the merits because the City's policy of "imminently destroying" their "bulky personal possessions" violates their Fourth Amendment rights. *See* Mot. 1:15-19.

In *Lavan*, the Ninth Circuit held that seizing and destroying unhoused plaintiffs' unabandoned property "meaningfully interfered with" the plaintiffs' possessory interests in that property, and that doing so summarily and "on the spot" made the seizure unreasonable under the Fourth Amendment. 693 F.3d at 1030-31. The City did not challenge whether the seizure was unreasonable, *see id.* at 1029 n.8, but rather contested whether the Fourth Amendment applied at all to the plaintiffs' property, *id.* at 1027-30. Additionally, the Ninth Circuit recognized that the summary destruction violated the plaintiffs' Fourteenth Amendment rights to "continued ownership of their personal possessions" because the City did not "take reasonable steps to give

notice that the property ha[d] been taken so the owner [could] pursue available remedies for its return." *Id.* at 1031-32 (citation omitted). The City was obligated but failed to "comport with the requirements of the Fourteenth Amendment's due process clause" before taking and destroying property, including by giving "notice and an opportunity to be heard" before seizure and destruction. *Id.* at 1032 (citations omitted).

In *Garcia*, the Ninth Circuit again held that during cleanups of homeless encampments, "prohibit[ing] individuals from moving their Bulky items" and instead "immediately destroy[ing]" them violated the individuals' Fourth Amendment rights, extending *Lavan*'s holding to the "large objects" at issue. *Garcia*, 11 F.4th at 1119. Again, the City did not argue that the seizures were reasonable, but rather contended that the underlying ordinance was valid given a severability clause. *Id.* at 1119-24. The court "emphasize[d]" that its holding was "that the government may not summarily destroy the unabandoned personal property of homeless individuals that is kept in public areas." *Id.* at 1124.

The present case is different from *Lavan* and *Garcia*. Though here too the impending seizure and destruction of the plaintiffs' property interferes with their possessory interests under the Fourth Amendment, *see Lavan*, 693 F.3d at 1027-28, the plaintiffs are unlikely to succeed on their assertion that these actions are unreasonable, *see San Jose Charter of Hells Angels Motorcycle Club v. City of San Jose*, 402 F.3d 962, 975 (9th Cir. 2005) ("*Hells Angeles*") (noting "[r]easonableness is the touchstone of any seizure under the Fourth Amendment" and that any seizure must be "reasonable under the circumstances"). The Ninth Circuit in *Lavan* and *Garcia* both emphasized that the *summary* nature of the destruction of the plaintiffs' property rendered the seizures unreasonable. In *Lavan*, 693 F.3d at 1024, city officials seized and destroyed belongings that were "momentarily unattended," and in *Garcia*, 11 F.4th at 1117, the officials "immediately destroy[ed]" belongings and prohibited individuals from moving them, even during clear-outs that were not noticed or scheduled. *See also id.* at 1125 (Bennett, J. dissenting) (noting the provision permitted the government to seize and destroy the items "[w]ithout prior notice" (quoting L.A. Cal. Mun. Code § 56.11(3)(i) (2016))).

Here, there is no similar summary destruction. The plaintiffs have known for weeks or

4

1  months that the 1707 Encampment would be closing and that they would have to move their
2  belongings. They have known the City's policy since at least the midst of the *Blain* litigation,
3  which began in summer 2022 and wrapped up early this year. The policy itself guarantees storage
4  of some belongings, and "in practice . . . allows individuals a reasonable amount of time" during
5  the clear-out to pack and move belongings. Simmons Decl. ¶¶ 12, 21; *see also* [Dkt. No. 25-1]
6  Exs. I, K. With respect to the particular items in the motion, the City has offered storage for
7  plaintiff Janosko's trailer, Oppo. 4:17-20, but Janosko's counsel confirmed his refusal at the
8  hearing because it forced him to choose between keeping his trailer and living with his
9  community—though an undoubtedly difficult decision, that does not change fact that the City
10 offered storage. Additionally, the City refused to store "tiny homes" and other makeshift
11 structures due to the unsafe and decaying nature of the materials, and has refused to move and
12 store a 20 to 40 foot long shipping container given the City's inability to search and sort through
13 the contents to assess whether any are hazardous or unsafe. Simmons Decl. ¶¶ 23, 25; *see also*
14 Oppo. 5:8-7:24. Both of these refusals are reasonable given "the countervailing governmental
15 interests at stake" including safety of City workers during the clear-out and at its storage sites, as
16 well as the health and safety of local neighbors. *See Hells Angeles*, 402 F.3d at 975.
17   The plaintiffs seemed to argue at the hearing and in their motion that *Lavan* and *Garcia*
18 stand for the proposition that the government must store any belongings that it seizes during any
19 closure of a homeless encampment. While both cases held that the destruction of the property at
20 issue was unreasonable, again both emphasized the *summary* nature of the destruction. Here, any
21 destruction is not summary: the plaintiffs have known since last summer that they would have to
22 move their belongings, and at the very least since December 22, 2022, which makes this case
23 different from *Lavan* and *Garcia*, where city showed up unannounced and commenced immediate
24 destruction of property.
25   Additionally, the property at issue here is plainly different from the property in *Lavan* and
26 *Garcia*, which is another reason that its seizure and ultimate destruction is not similarly
27 unreasonable. *See id.* at 975 (considering the "totality of the circumstances" in assessing
28 reasonableness). In neither case was there any contention that the property seized and summarily

5

1  destroyed was dangerous, hazardous, or otherwise unsafe.  Indeed, in *Garcia*, the City Policy had
2  a separate section—uncontested by the plaintiffs—that provided for discarding and not storing
3  property that "constitute[d] an immediate threat to public health or safety or [was] evidence of a
4  crime or contraband."  *Garcia*, 11 F.4th at 1116.  That section of the policy was not addressed by
5  the *Garcia* court but parallels what is at issue here.  And because the City of Oakland provided
6  substantial notice, helped unhoused individuals move and store some belongings, and gave the
7  individuals time and opportunity to move any items that the City would not store, its policy and
8  actions—at least as demonstrated at this preliminary motion—are reasonable under the Fourth
9  Amendment.

10  Finally, any resulting destruction based on the City of Oakland's policy is narrow: unlike
11  the Ninth Circuit cases, where the officials destroyed belongings for being unattended or for being
12  too large, here the officials say only belongings that are hazardous or dangerous to move or store
13  may be destroyed.  This is not an arbitrary policy, as the plaintiffs contend.  Rather, this distinction
14  is reasonable, given the City's interests in health and safety—as well as the overriding interest in
15  clearing the encampment so as to build a large affordable housing development for its citizens.
16  *See Hells Angels*, 402 F.3d at 975 (looking to the "totality of the circumstances" to determine
17  reasonableness, including balancing the Fourth Amendment intrusion with the government's
18  interests).  Indeed, as the City asserts, it would be unreasonable to require the City to store any and
19  all belongings at the 1707 Encampment for an indefinite period of time.

20  For those reasons, the plaintiffs are unlikely to succeed on the merits of their Fourth
21  Amendment claims[2] and this counsels against entering a TRO.  *See Winter*, 555 U.S. at 20; *see*

---

[2] At the hearing, the plaintiffs emphasized that this motion only asserts Fourth Amendment claims, not Fourteenth Amendment claims, and seemed to argue that notice is not relevant to the Fourth Amendment analysis.  While I understand the plaintiffs' point, the touchstone of the Fourth Amendment is reasonableness, *Hells Angels*, 402 F.3d at 975, and whether the City provided notice is relevant to the reasonableness inquiry.  I also note that while the court in *Lavan* separately analyzed due process from the Fourth Amendment, that was in part because the city did not challenge the reasonableness finding of the district court.  The Ninth Circuit did *not* hold that notice could only be analyzed under the due process inquiry in similar cases.  Accordingly, I incorporated the fact of notice into the reasonableness inquiry here.  But notice is not dispositive, and my analysis does not hinge solely on notice—indeed, as explained above, it addresses the totality of the circumstances and balances the countervailing governmental interests.  *See Hells Angels*, 402 F.3d at 975.

1  *also Garcia*, 11 F.4th at 1118 (noting the success on the merits factor is the "most important"
2  (citation omitted)).

## II. REMAINING *WINTER* FACTORS

The other factors also show that the high standard for implementing a TRO is not met here.

The plaintiffs make a strong showing of irreparable harm from the destruction of their property. While the City has properly provided several storage and shelter options as well as significant notice, the reality is that the plaintiffs and other residents are unhoused for a variety of reasons, and some of their mental and physical challenges—exacerbated by poverty—may make it difficult to find storage for their structures and the shipping container while living in the city-run shelters. And the plaintiffs assert that if they cannot store the makeshift structures, tiny homes, and container, they will be destroyed, which will affect their shelter options should they be removed from the City-funded shelters. *See* Mot. 9:13-25. This factor favors the plaintiffs.

However, the balance of equities and public interest have long since tipped toward the City. *See Winter*, 555 U.S. at 20. The fundamental purpose of clearing the 1707 Encampment is to develop the site into an affordable housing development, "one critical solution to homelessness" in the City's long-term plan to address the housing crisis in Oakland. [Dkt No. 16-1] ¶¶ 11-14. As I noted in my first order from January 6, "[t]hat development will significantly benefit the public interest." [Dkt. No. 18] at 6:20-21. Here I find the public interest favors denying the TRO so that the City may continue its work to clean up the site, stay on track to achieve its funding, and ultimately provide housing for "500 extremely low, low, and moderate income individuals," including formally unhoused individuals. [Dkt. No. 16-1] ¶ 12. *See also Winter*, 555 U.S. at 24 (noting that courts must "pay particular regard for the public consequences in employing the extraordinary remedy of injunction" (citation omitted)).

And while the balance of equities may have tipped more toward the plaintiffs during earlier stages of this litigation—such as when they had less notice of the impending clean-up and there were insufficient shelter beds available during periods of worse weather and public health—the City has now provided shelter beds (including the tiny cabins and new RV site discussed in my prior orders), offered to store belongings, helped to move some items, and provided months of

notice for the residents to move their own belongings. The process has been prolonged and repeatedly delayed, but the City has shown the balance of equities favor its position and favor finally starting the process of developing affordable housing at the site.

Accordingly, the *Winter* factors are not met here. The TRO is denied.

## CONCLUSION

For those reasons, the plaintiffs' motion is DENIED.

**IT IS SO ORDERED.**

Dated: April 19, 2023



William H. Orrick
United States District Judge